under advisement and called the last case for today. I.H. v. Countyof Lehigh, et al., number 08-2766, Professor Salzberg, is it Kocher? Kocher, and Mr. Yenemy. Did I pronounce that correctly? Yenemy. Okay, thank you. Judge Ambrose, may it please the Court. My name is Stephen Salzberg, and along with Eric Weitz, we represent the guardian for I.H., Isaiah Harris, a child who rendered a quadriplegic as a result of an automobile accident. And, Judge Ambrose, I'd like to reserve three minutes for rebuttal, if I may. Fine. There's only one issue in this case, and that is whether the district court erred in granting summary judgment to the Lutheran Home, which was the home under contract with the county, to provide foster care for children like Isaiah. Actually, in this case, the allegation was that the foster father was negligent in driving the automobile, and the Lutheran Home was vicarious. Well, I'm not sure we know if he was negligent or not. I mean, he took his eyes off the road when I.H. was biting the biological son of Mr. Norton, and he turned his head for a moment, and there was an accident, and his son got killed, and I.H. was paralyzed, and there was severe injury to Mr. Norton. But, let's assume for the moment there was negligent. As the jury found. And, what you're trying to do is impute the actions of Mr. Norton, with regard to this accident, to others that engaged Norton to begin with. That's correct, Your Honor. The contention here is that Mr. Norton was, in fact, the servant of the Lutheran Home, and that the Lutheran Home was vicariously liable under Pennsylvania law. And, you're relying, I think, from what I can gather, principally on the Smollett case of the Pennsylvania Supreme Court. Is that correct? We are relying on the Smollett case, but on the Smollett case is one of cases where the Pennsylvania Supreme Court has recognized the master-servant relationship, and defined it. But, Smollett is a good case. In Smollett, it looks like what they're saying is, in the past, we have said that there can be imputing with regard to a principal agent, whatnot, or vicarious liability found. But, that was, turns out, that was an overstatement. We really need to refine that. And, that it can only be found in the context of a master-servant, like your employer at the office controlling what the employee does. This doesn't seem to fit that. Let me, may I address that directly? Sure. I don't disagree with you. I think it's very clear that, right now, that the Pennsylvania Supreme Court has said it's not just enough, generally speaking, that you have a principal agent relationship. It has to be something more. And, the more is the right of control. And, in this case, I submit that there is no situation in which there'll be a clearer right of control than exists in this case. And, let me be, let me point you to why I say that. The contract between the county and the home provided that it is the home that would provide foster care. And, the home had a non-delegable duty to do that. Now, the district court said, well, once the home found a foster parent, the foster parent had all the rights of ordinary parents and operated accordingly. What it says is that the provider is deemed an independent contractor and shall not, during the term of this contract, among other things, delegate any or all, any, all or any part of its obligations or responsibilities without prior written approval of the county. But, isn't its principal responsibility to find foster parents? That's not, that is not in the contract. It is, its principal responsibility is to provide foster care. However, it chooses to do that. If it hadn't found foster parents, it would have had to provide foster care. It would have had to employ people to provide foster care. And, let me address what it is that the home retained in the way of power. The district court said, in its opinion, that parents could go and buy clothing for their children like ordinary parents could. It's not true. The contract between the Lutheran home and the parent says you can't buy clothing. You need our permission to buy clothing. What about transportation? The contract between the county and the home says, in one of the addenda, says that the home, that is the provider, is responsible for transportation. Indeed, in the contract with, between the home and the foster parents, the home exercised that control. But, actually, in this case, the only, for transportation, all you needed to do was have somebody with a license, right? No, that's not actually true. If you, if you look, your honor, at the contract between the home and the parent, the actual home required, this was their order to the parents, that they actually put the foster child in a car seat that met federal safety standards. And, if you take judicial notice of when it is that Pennsylvania law required safety seats for children, you'll see that came after this accident. In fact, the home set the standards. The home decided who could drive. The home decided which people the parents could authorize to drive when they weren't. The home was in control of that. Indeed, in this case, the home was, the home was contractually bound to take care of discipline. What you're really, you're saying that the home has day-to-day control. The home did have day-to-day control, exercised day-to-day control, and they were required to do that. They were required to discipline the child. Contract between the county and the home under provider, not the foster parent, that will set the standards of discipline. And, one of those standards of discipline, of course, as your honor points out, is how do you deal with a child who behaves badly in an automobile. That was the home's responsibility. This case is all about whether a county can, if it chooses, make a provider like the Lutheran home responsible for all of the actions of its servants, the people it chooses to be foster parents. And, one of the other facts we did not mention in the brief. Mr. Goldsberg, a moment, if you will. I don't understand your proposition. You mean to say that if a child acts badly in the presence of his foster parent, and the Lutheran home is not present at that time, indeed is some distance away, that the Lutheran home is responsible for disciplining the child at that point? The Lutheran home is responsible. Is that what you're saying? Not exactly, Judge Garland. May I explain? Tell me exactly what happens when a child has a tantrum in the back seat of a car, which is approximately 20 miles away from wherever the Lutheran home is. Under the contract between the home and the parents, any change in circumstance? Now, just tell me what the Lutheran home is supposed to do in the way of the discipline that you said must be employed. The Lutheran home is required by contract to set disciplinary standards. They have required the parents to inform them of any change in circumstances, so that behavior that the child engaged in that was disruptive or improper behavior requiring discipline is something the home is supposed to be notified of, and then the home is to decide how the parents are to deal with it. That was their responsibility. Now, obviously, I am not saying that the home, if it does not happen to be there, is responsible in the moment for the discipline. They are responsible once they are informed of setting the discipline standards and telling the parents what it is there to do. I point out that while the home received income from the county, the home told the parents by contract that you are not to declare anything that you received from us as income, that every dime you receive is a reimbursable expense. That is, there has never been an independent contractor, to my knowledge, who has not had the right to decide what to do with the money that it received and whether it is actually income for services rendered. In this case, it is very clear. Isn't this situation somewhat akin to a franchisor, franchisee, where the franchisor says you will maintain certain standards of cleanliness, you will display certain signs, you will have certain arrangement of your goods for sale, and that they maintain and they inspect this compliance, but within that framework, the franchisee is free to conduct the business and is liable for what happens in the business? One big difference, Judge Roth, and that is the typical franchise agreements that I have seen do the opposite of what happens here. The franchisor does not want to be responsible for the actions of the franchisee. And indeed, they make clear that the franchisee, aside from having to meet these obligations... But whoever wants to be responsible or not, isn't that not a good analogy as to the control that is exercised or not exercised? I don't want to ever reject an analogy set forth by the judge asking me the question, but I would say this. If in the contract, the franchisor said, we are imposing upon you non-delegable duties on the franchisee to do certain things, the franchisee would be responsible and accepted that for whatever the people the franchisee chose to work with were doing. In this case, the county has said, and by the way, counties have a choice when it comes to how they go about foster care. This Court clearly will recognize that. We're not saying counties have to sell foster care agencies like the Lutheran Home. You must be responsible for foster parents. But we are saying that a county has the right to impose a non-delegable duty standard and to say, you are going to be responsible for them. You are going to have to insure them. You are going to be held responsible for whatever they do. That's the system we want. That's the system that protects children. I mean, after all, the notion that in the briefs that you have, the amicus briefs, that somehow the argument we're making is seeking to bankrupt homes like Lutheran Home is exactly wrong. What we're trying to say is somebody is going to pay for what happens to foster kids when they're injured. And that is, if you say, oh, there's no respondeat superior liability here, it's going to be the taxpayers. This kid- Well, it's going to be the foster parents and their insurance coverage. Well, there's not, as you know from the record, I think in this case, that the foster parents had a liability policy that's exhausted on the automobile coverage. And indeed, in this case, it is the Lutheran Home that had insurance. It's the Lutheran Home that was required to have insurance. It was required to insure its subcontractors. And the county was entitled under Pennsylvania law to impose this burden on its foster care agencies if it chose to do. And if it wanted, as it did, if it wanted them responsible, if it wanted to make- It's hard to imagine a contract, Judge Roth, that you can write that would be any clearer than this, which is you're going to be responsible for things like transportation. You can't delegate it. It is your duty. And you can choose who you want to provide these services. You can say, parents, you can't drive. Our drivers will drive. But that's the choice the home made as to how to allocate its non-delegable duty. But it was responsible under this contract. And it is responsible under any fair reading of Pennsylvania law. How do you respond to the arguments that the amici make that if we were to be the first federal appellate court to rule in your favor, that this would not throw a monkey wrench, this would literally unhinge, implode the system that we have for foster care in this country? I have an important question, and I'd like to answer it three steps, because I think it's a very clear answer. Number one, there is no federal appellate court that's come out the other way. This is a case, a first impression, and it's all Pennsylvania law. We're not asking you to create federal law. Number two, the argument that is made makes no sense. The argument seems to assume if you hold that this contract says what it says, so you're recognizing that Lehigh County can impose this kind of a burden on foster care agencies because it decides that that's a better way to do it than to have taxpayers pay for injured kids. Any other county in Pennsylvania is perfectly free to write a contract that says you're an independent contractor and your foster parents are going to be independent contractors too. And that would mean that this would go away as an issue. But third and final, that this court, it would be a strange ruling indeed for this court, as the first appellate court to address this, to say that a county like Lehigh cannot choose to protect these vulnerable children, cannot choose to set up a system where there will be insurance, and will require insurance, so that these kids, if they are hurt, are going to find protection beyond what the taxpayers can give them. I mean, this is all about choice. And Lehigh County made a choice. And the argument that's being thrown at you is somehow if you decide this case one way, you're going to bind the counties. And you're saying that the choice requires us to come down that there was a master-servant relationship. Let me ask you. You came out a minute ago talking simply about the motor vehicle insurance area. Now, in your brief, you seem to be arguing broadly a master-servant relationship that would cover many aspects of what was done and what a foster parent might do, what a foster child might do. Are you limiting your argument to a requirement that the Lutheran Home or the agency contracting to provide foster care is required to get motor vehicle insurance to cover injuries of foster children? Or are you arguing a broader span of argument? It's a broader span of argument that a fair reading of the contract between the county and the home is that the county specified exactly what insurance, when it came to insurance, that they were going to have to get and who was going to be covered by it. But they also specified a number of other things that they were non-delicately responsible for. And so argument is they were responsible for everything they promised the county that they would undertake. Thank you very much. Thank you. Ms. Coker. Good morning. May it please the Court, my name is Kim Coker. I represent the Lutheran Home at Topton. I'll be sharing three minutes of my time with John Unanik, who is counsel for the Pennsylvania Children and Youth Administrators Association, who will address the policy issues that arise in this appeal. This case requires only a very straightforward application of the control test under Pennsylvania law and under universal AMCAM. Might there be, or one could argue, a middle ground? They're saying there is a master-servant relationship. You're saying definitively there is not. But when you look at, for example, cases like Smollett, it says that those rendering service but retaining control over the manner of doing it are not servants. They may be agents agreeing only to use care and skill, et cetera. Isn't there a possibility that this is a question that needs to be worked out at trial? There are no disputed issues of fact. Plaintiffs have, in fact, admitted that the relationship between these parties are defined by state regulations and the contracts between the parties. Those are pure questions of law. There are, in fact, no questions of fact to be resolved by a jury, and plaintiff's counsel has never pointed out a single question of fact to be resolved by a jury. A master-servant ultimately comes down to the degree of control, in this case, on a day-to-day basis. Why wouldn't that be a good candidate for sorting out by a jury? Because there's no, because the day-to-day control, the contractual relationship defines the relationship between the parties and limits Lutheran Homes' duties vis-a-vis the foster care parent. And in this case, the contracts, the service contract itself, imposes on Lutheran Home only the duty to provide foster care services. The placement agreement sets forth about 20, and the placement agreement and the handbook pass through state regulations. There are about 20 itemized requirements. They all have a corresponding Pennsylvania Code provision. If they don't have a corresponding Pennsylvania Code provision, then they are dependent on other motor vehicle laws, child labor laws, or just pure administrative tasks, like providing contact information or clothing allowance. None of those provisions has anything to do with control over the foster parent in his day-to-day parenting of the child. That is left up to the foster parent, and that's the design of the system. The whole system's goal is to provide foster care in the least restrictive, most family-like setting. But in light of the kind of decision that Professor Salzberg is seeking here, in light of what's already been done by the Connecticut and Massachusetts courts, it would seem it would be time to have a relook at how these contracts are drafted in order to protect yourself. Protect yourself more, perhaps. First, the more important case law, I believe, is Universal AMCAM, and that's our Pennsylvania Supreme Court decision, which clearly held that where a putative master is merely requiring compliance with state regulations, that that is not probative of the master-servant relationship. And the court explained it's because where the requirement is to comply with state regulations, it is the law and not the initiative of the putative master who controls the work to be done. And most of these contracts, most of the requirements imposed on Peter Norton by Lutheran Home have to do with compliance with the Pennsylvania Department of Public Welfare regulations. But what Professor Salzberg is saying is, yes, they've done that and they've gone further. They've required more, and they've intruded on things, you know, all the way down to discipline. Discipline. If you compare the discipline provision in the placement agreement, I think it's an appendix to the service contract and it is one of the itemized pieces of the handbook, the disciplinary provision is almost a verbatim recounting of the Pennsylvania Code provision on discipline. So discipline, transportation, all of those items are dictated by the Pennsylvania Code. And as I said, where there's not a corresponding Pennsylvania Code provision, there is another... You're saying there's nothing in here, nothing in this contract at all that isn't directly required by a regulation of the state or federal government. To the extent there is anything that was Lutheran Home's own initiative as it pertains mostly to really administrative functions like clothing allowance or provision of emergency contact numbers or provision of numbers or permission to take the kids on vacation. But it doesn't have to be a complete lack of indicia of a master-servant relationship for the court to hold that there is no master-servant relationship. In universal AMCAM, there were certain indicia where the trucker had to still report in every 24 hours, had to take a mandatory one-hour break and had to do certain other tasks required by the... Yeah, but that's pretty clear that it was regs that existed that you had to make sure were complied with by the trucker. Right, but he also had... In that case, there were also certain facts that the owner required of... or certain requirements that the owner required of the trucker that weren't required by state regulations or federal regulations. But those were not enough to tip the scales in favor of finding a master-servant relationship because the essential functions of the trucker in that case were dictated by federal law. And that's exactly the case here. And even in the case of the franchise agreement, the Muskowski opinion from the Pennsylvania Superior Court is very similar to this case. There, the contract between the franchisor and the franchisee was dictated, the rules to be abided by, the quality control, there was supervision, and there were other factors that favored a master-servant relationship in that case. But the overriding feature of the contract was just that of supervision and setting goals, and that alone is not enough to establish a master-servant relationship. And that was Lutheran Homes' role in this case. What about the argument that's being made that it isn't just control, it's the right to control? You have, it is argued, an unfettered right to come in and take over the situation at any time. Why isn't that a master-servant relationship? Because that right exists. The state regulations at 55 PA Code 3700.4 define a foster care agency as an agency which recruits, approves, supervises, and places children. It defines a foster parent as the individual responsible for providing foster care. The contracts are written in light of those code provisions. The service contract provides that the scope of work, this is the service contract between the county and the foster care agency. This is what Lutheran Home agreed to take on from the county. The scope of work is foster care services. The plaintiffs rely on provisions taken out of context from the appendix where there's language to the effect that the Lutheran Home agreed to provide a temporary living environment in the form of foster family care. That is always in the context of an agreement, a placement agreement with a foster family. Their reading provide far too narrowly to suggest that it meant Lutheran Home itself undertook the duty to provide foster care. This is always in the context of provision of foster care indirectly through a foster family. If you didn't have foster parents, who would be doing the caring for the children? There is no provision in the contract that would require Lutheran Home itself to take in foster kids if there weren't a parent available in the state. So it's not an orphanage? Pardon me? It is not an orphanage? It is not an orphanage. Its role is to assist the county in placing children in foster families. And that's set out in the contract and that's consistent with the Pennsylvania regulation. But also in maintaining a check on whether the foster families are performing appropriately. Right. For a monitoring role. Yes, it had a supervisory and monitoring role inspecting the progress of the work and under Pennsylvania law that is not sufficient to establish a master-servant relationship. Does the Lutheran Home provide any insurance coverage to protect the children either in motor vehicle situations or health situations or any type of situation? It has insurance coverage which may be implicated in a direct liability claim but their direct liability claims were dismissed and that's not on appeal. So if a child was in a Lutheran Homes vehicle is that the type of direct responsibility you're talking about? Right. Their argument also is ineffective for several other reasons. Not only is it not is it inconsistent with the contract but it is a direct their non-delictable duty claim is a direct liability claim. That's not even a vicarious liability theory and their direct liability claims were dismissed by the trial court and they did not appeal that part of the trial court's order.  the With regard to the right to control when would Lutheran Homes go in and intervene then? There was one incident and that's cited in the fact sections of the briefs where Isaiah was found non-responsive in a swimming pool. The county required the county has a has its own duty to supervise and inspect. The county required Lutheran Homes to go in in that instance after the fact to just monitor the placement. There's normally under the contractual relationship bi-weekly visits in the very beginning of the foster family relationship that trails off over time and the county asked Lutheran Homes or required Lutheran Homes to go in and spot check actually that isolated incident but that wasn't the relationship that continued over the rest of the almost year-long relationship with Peter Norton. The and the issue of the money that this was a $44 a day contract. Lutheran Homes kept $27 and if plaintiff's theory is correct that means that Lutheran Homes agreed for a dollar an hour to have the responsibility of supervising this child 24-7 and conversely when you look at Peter Norton's perspective that meant he invited complete control over his family home for $17 a day and that just defies common sense. I'm going to leave the rest of my time ahead. You're saying that of the $44 there's $27 of it goes to Lutheran Homes and $17 goes to Norton? Right. So it sounds like there's more control by Lutheran Homes than there is of Norton? That's their argument that because they kept 60% of the fee that that is somehow indicative of a master-servant relationship. That's no different than any contractor subcontractor independent contract relationship and the fact that it is only $44 a day if they are going to impose on Lutheran if they say Lutheran Homes had the right to control the child 24-7 that means it had a corresponding duty and that means that it would boil down to just over a dollar an hour that Lutheran Homes would be compensated to have that burden. You can flip that and say it's even worse for Norton. I agree. Except Norton was just covering expenses right? This is not a $17 a day job that he took. This is foster parent does this for a labor of love. Those were to cover his incidental expenses for transportation you know pen money for the kids. This isn't meant to be a financial windfall for foster parents. Okay. We'll hear from Mr. Yannanick then. Thank you. Thank you. May it please the court my name is John Yannanick I'm from the law firm of Medievans and Woodside and Harrisburg. Let me ask you if the you have had so far adverse decisions in the Hunt case in Connecticut in the Archer case in Massachusetts what's been the fallout from that at all if anything? I mean you're talking about the consequences that the system will implode that they won't be able to do anything but you you've got two exemplars so far what's happened? I represent the county association of Pennsylvania and the way the Commonwealth of Pennsylvania has structured their handling of foster care for children in this state. I cannot speak to the system of the          to foster care and what if anything I mean and a lot of the amicus briefs in fact these administrators that report to each county commissioner and what they know is how this system works in Pennsylvania and in this system in Pennsylvania these county commissioners have a children and youth of children in foster care and foster care a lot of times through a private entity such as a Lutheran home. In this case the county contracts with the private foster care agency to do that work and these private agencies there's about close to 250 of them in the state a lot of them are non-profit work on a shoestring budget do a lot of their own fundraising and provide some of the financial resources for the care of these children in the commonwealth. But the question here is there such control that it passes a threshold that you can say that there is in effect a master servant relationship? No your honor there's standards set there's standards set that are have to be enforced because we have so many federal and state guidelines that have to be passed down that does not create a master servant relationship it's important to understand there are 20,000 children in the commonwealth that are involved in this. What is not controlled theoretically on a day-to-day basis? The simple decisions like Judge Garth said how do you discipline a child for something that's immediate. It's preposterous to think that Lutheran Home would have the responsibility to effect an immediate correction to a child's misbehavior. But they did come in and say stop spanking this kid. Well if that is not within the standard that is set for them by regulation then that's a standard issue. It's not something that's a day-to-day issue. Thank you. I see my time is up. Thank you very much. Professor Salzberg. I'd like to answer a couple questions that you asked, the court asked, the employees. And number one, did the Lutheran Home have responsibilities beyond just enforcing state and some federal law? And the answer is clearly they did. There's nothing in state regulations that tells you where a kid should go to school, how many clothes he should have or whether he can go to camp. But in this case where you have someone driving, what control over the driver? He had no right to use a particular automobile unless authorized by the Lutheran Home. He had no right to have more than one child in the car unless authorized by the Lutheran Home. He was required by the Lutheran Home to have the child in a car seat, didn't do it. The Lutheran Home was totally in charge of transportation as required by their contract. Judge Ambrose, you asked the question and it relates to something Judge Garth asked me. You asked were there factual issues here beyond what's in the contract? The answer is yes. In our brief at pages 5-6 we pointed out that the Lutheran Home intervened when it felt the discipline was the wrong discipline. They came into the home and said you can't do this we're going to tell you what you should do. And the question is when the child drowned and was resuscitated fortunately Lutheran Home intervened when it felt the discipline       is when the child drowned and was resuscitated fortunately Lutheran Home intervened when it felt the discipline was the wrong discipline. Now if there's anything in the day-to-day operations that suggests that the contract with the non-delegable duty wasn't actually carried out the way the county intended that is something that a trial court and a jury ought to answer. And that any worry this court might have about adverse consequences can clearly be taken care of by simply having agencies and counties write contracts and make it clear who they want to be responsible. It is not unreasonable for Lehigh County which is not before this court and not complaining about the fact that vicarious liability is being sought here. Nothing unreasonable about them wanting to make sure that the agencies with which they deal like the Lutheran Home take responsibility and that they provide the insurance. But in this state the argument is I think you have what 245 entities that function in the same capacity as Lutheran Home and about 90 plus percent of them over 90 percent of them are non-profit agencies and that if you rule your house out of the way that there will be a catastrophic effect on how they are able to do their jobs if indeed they are any longer able to do their jobs. They may just say that's it we won't do it anymore. Judge Roth the answer to that of course is clear as the Supreme Court has recognized in other contexts like Mesonado when it comes to bargaining which is if homes like the Lutheran Home say that we won't operate if we are responsible for foster parents then the county is going to have to decide whether or not to   Lutheran Home. And that's what's happened which is groups like the Lutheran Home got insurance. They are being defended without a reservation of rights in this case by an insurance carrier. They anticipated that this could happen and that's something that the county has a right to insist upon. You spread the cost over by doing it through insurance. It's a very efficient means that this court would recognize as applicable in any number of circumstances but if some of the agencies said we can't afford the insurance they would be saying to counties if you insist on this regime we won't be able to participate and then what will happen is it will get worked out. But it's not something that can be easily determined but if you're saying across the board that the Lutheran home is vicariously liable for any negligently caused injury to the child then I think we don't know what the scope is and it's frightening to think what effect that may have on those who provide care to foster children. It's been the case Judge Roth I think for a long period of time that in responding out superior relationships employers have often said never know what our employees are going to do and we can't be there to control them 24 hours a day and yet we hold employers who have the right of control responsible. The answer I think to your question is that counties can work this out with the agencies with which they deal. If they want to say you are only required to have automobile insurance and you are not going to be held responsible and you should make clear in your contracts with the foster families they can do that. This is workable by contract but as I've said to Judge Ambrough I don't think this is the right to have a transcript prepared of this oral argument and to split the cost if you would in connection with that. Again thank you. Any students from Roth, Garth and I can confer. We're going to hang here while people are leaving. Thank you.